**BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire
Ryan P. Cardona, Esquire
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (610) 667-9029
esmith@brodskysmith.com
rcardona@brodskysmith.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANISHA SHAH, individually and on behalf of all others similarly situated, | Civil Action No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATIONS OF SECTIONS 14(e), 14(d), AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| v. | |
| AIMMUNE THERAPEUTICS, INC., JAYSON DALLAS, GREG BEHAR, PATRICK ENRIGHT, KATE FALBERG, BRETT HAUMANN, MARK IWICKI, MARK MCDADE, and STACEY D. SELTZER, | **JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiff Manisha Shah ("Plaintiff"), by her attorneys, on behalf of herself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to her, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this stockholder class action on behalf of herself and all other public stockholders Aimmune Therapeutics, Inc. ("Aimmune" or the "Company"), against Aimmune and the Company's Board of Directors (the "Board" or the "Individual Defendants," and collectively with Aimmune, the "Defendants"), for violations of Sections 14(e) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and for breaches of fiduciary duty as a result of

Defendants' efforts to sell the Company to Sociétés des Produits Nestlé S.A. ("Parent"), and SPN MergerSub, Inc. ("Merger Sub," and collectively with Parent, "Nestlé") as a result of an unfair process for an unfair price, and to enjoin an upcoming tender offer on a proposed all cash transaction valued at approximately $2.6 billion (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in an August 30, 2020, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").  Under the terms of the Merger Agreement, a subsidiary of Nestlé will commence a tender offer to acquire all of the outstanding shares of Aimmune's common stock at a price of $34.50 per share in cash.  As a result of the Proposed Transaction, Aimmune stockholders will be frozen out of any interest in the surviving entity.

3.      Thereafter, on September 14, 2020, Aimmune filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC in support of the Proposed Transaction.

4.      The Proposed Transaction is unfair and undervalued for a number of reasons. Significantly, the Recommendation Statement describes an insufficient process in which the Board rushed through an inadequate "sales process" with the sole goal of a sale to Nestlé, who already owns approximately 19% of the Company.

5.      In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell Aimmune without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or the Nestlé without regard for Aimmune's public stockholders.  Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Aimmune stockholders.

6.      In further breach of their fiduciary duties, on September 14, 2020, Defendants caused to be filed the materially deficient Recommendation Statement with the SEC in an effort

to solicit stockholders to tender their Aimmune shares in favor of the Proposed Transaction. The Recommendation Statement is materially deficient, deprives Aimmune stockholders of the information they need to make an intelligent, informed and rational decision of whether to tender their shares in favor of the Proposed Transaction, and is thus in breach of the Defendants fiduciary duties. As detailed below, the Recommendation Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process leading to the Proposed Transaction; (b) the financial projections for Aimmune, provided by Aimmune to the Independent Board Members' financial advisors J.P. Morgan Securities LLC ("J.P. Morgan") and Lazard Frères & Co. LLC ("Lazard"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinions from J.P. Morgan and Lazard to the Independent Board Members.

7. Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff and the Class. This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from violation of the federal securities laws by Defendants.

## PARTIES

8. Plaintiff is a citizen of Canada and, at all times relevant hereto, has been an Aimmune stockholder.

9. Defendant Aimmune a clinical-stage biopharmaceutical company that develops and commercializes product candidates for the treatment of peanut and other food allergies. Aimmune is incorporated under the laws of the State of Delaware and has its principal place of business at 8000 Marina Blvd., Suite 300, Brisbane, California 94005. Shares of Aimmune common stock are traded on the NasdaqGS under the symbol "AIMT."

10. Jayson Dallas ("Dallas") has been a Director of the Company at all relevant times. In addition, Dallas serves as the Company's President and Chief Executive Officer ("CEO").

11. Defendant Greg Behar ("Behar") has been a director of the Company at all relevant times.

12.     Defendant Patrick Enright ("Enright") has been a director of the Company at all relevant times.

13.     Defendant Kate Falberg ("Falberg") has been a director of the Company at all relevant times.  In addition, Falberg serves as the Chair of the Audit Committee of the Company.

14.     Defendant Brett Haumann ("Haumann") has been a director of the Company at all relevant times.

15.     Defendant Mark Iwicki ("Iwicki") has been a director of the Company at all relevant times.

16.     Defendant Mark McDade ("McDade") has been a director of the Company at all relevant times. In addition, McDade serves as the Company's Chairman of the Board.

17.     Defendant Stacey D. Seltzer ("Seltzer") has been a director of the Company at all relevant times.

18.     Defendants identified in ¶¶ 10 - 17 are collectively referred to as the "Individual Defendants."

19.     Non-Defendant Nestlé together with its subsidiaries, operates as a food and beverage company. Nestlé was founded in 1866 and is headquartered in Vevey, Switzerland. Parent common stock is traded on the OTC US Exchange ("OTC") under the ticker symbol "NSRGY."

20.     Non-Defendant Merger Sub is a wholly owned subsidiary of Parent created to effectuate the Proposed Transaction.

**JURISDICTION AND VENUE**

21.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(e) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

22.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either

CLASS ACTION COMPLAINT

present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Aimmune has its principal place of business is located in this District, and each of the Individual Defendants, as the Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Aimmune common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

25.     This action is properly maintainable as a class action because:

a.  The Class is so numerous that joinder of all members is impracticable.  As of July 24, 2020, there were more than 65 million common shares of Aimmune stock outstanding.  The actual number of public stockholders of Aimmune will be ascertained through discovery;

b.  There are questions of law and fact which are common to the Class, including *inter alia*, the following:

i.  Whether Defendants have violated the federal securities laws;

ii.  Whether Defendants made material misrepresentations and/or omitted material facts in the S-4; and

iii.  Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated.

c.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f.  Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

26.  By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Aimmune and owe the Company the duties of due care, loyalty, and good faith.

27.  By virtue of their positions as directors and/or officers of Aimmune, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Aimmune to engage in the practices complained of herein.

28.  Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

a.   act with the requisite diligence and due care that is reasonable under the circumstances;

b.   act in the best interest of the company;

c.   use reasonable means to obtain material information relating to a given action or decision;

d.   refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

e.   avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

f.   disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

29.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Aimmune, are obligated to refrain from:

a.     participating in any transaction where the directors' or officers' loyalties are divided;

b.     participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

c.     unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

CLASS ACTION COMPLAINT

30.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Aimmune, Plaintiff and the other public stockholders of Aimmune, including their duties of loyalty, good faith, and due care.

31.     As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Aimmune common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### Company Background

32.     Aimmune, a clinical-stage biopharmaceutical company, develops and commercializes product candidates for the treatment of peanut and other food allergies.

33.     The Company's lead Characterized Oral Desensitization ImmunoTherapy (CODIT) product candidate is AR101, an investigational biologic, which is in Phase III clinical trial for the treatment of patients with peanut allergy. The Company also engages in the research and development of AR201, a CODIT product candidate for the treatment of egg allergy in pediatric and young adult patients; and other CODIT product candidates targeting food allergies, such as cow's milk allergy. The Company aims to treat potentially life-threatening food allergies by reducing the severity of reactions, including anaphylaxis. Aimmune's marquee treatment Palforzia, is the first therapy approved by the U.S. Food and Drug Administration (FDA) for peanut allergies.

34.     Aimmune has a strategic collaboration with an affiliate of Nestle Health Science US Holdings, Inc. for the advancement of food allergy therapeutics; and clinical collaboration agreement with Regeneron Ireland Unlimited Company and Sanofi Biotechnology SAS to study AR101 with adjunctive dupilumab in peanut-allergic patients in a Phase II trial.

35.     In a March 16, 2020 Press Release after the January approval of the treatment, Defendant CEO Dallas commented, "We are pleased that peanut-allergic children are being treated with PALFORZIA just six weeks after its FDA approval. Our anticipation of and preparedness for the REMS program allowed for a swift and smooth implementation of those requirements. In

addition, our U.S.-based supply chain remains fully operational and commercial supply is available… Since our REMS website went live on February 21, well over 600 allergists are certified and ready to prescribe PALFORZIA to their patients. Our field team is continuing to meet with allergists to provide direction and information on the REMS process to help additional physicians and practices become certified and provide training on how to safely incorporate PALFORZIA into their practices."

36.     According to the Company's June 8, 2020 Press Release, patients were highly satisfied after nine months of daily treatments, "We are encouraged to see the majority of participants completing the nine-month ARTEMIS trial reported high global satisfaction with daily treatment with PALFORZIA, high confidence in the treatment, and moderate-to-high satisfaction with the convenience of the treatment… Hearing from patients directly is important for us to better understand the effects this treatment can have on their lives. The study participants felt treatment with PALFORZIA in the ARTEMIS trial was effective, which may help them better manage their peanut allergy and live their lives more confidently. Our hope is that these data will reassure families who may be considering treatment with PALFORZIA to help them make important shared treatment decisions with their allergists."

37.     An August 31, 2020 Fierce Pharma article on the Proposed Transaction commented on Palforzia's financial potential, "Early in its launch, Palforzia has been stricken with slow uptake given widespread lockdowns around COVID-19, Piper Sandler analysts wrote in a note to clients after the deal was announced. However, once allergy clinics start running at full speed, Palforzia could make the Nestlé's rich premium look like a steal in the long run. 'While we understand the uncertainty that COV(ID)-19 disruption presents, we also think as pandemic-related disruption recedes and Palforzia's true demand begins to manifest, *it will be deemed that Nestle got itself a bargain here*,' the analysts wrote."

38.     Clearly, based upon the positive outlook, the Company is likely to have tremendous future success with Palforzia and additional pipeline treatments, it should command a much higher consideration than the amount contained within the Proposed Transaction.

39.     Despite this upward trajectory, the Individual Defendants have caused Aimmune to enter into the Proposed Transaction for insufficient consideration.

*The Flawed Sales Process*

40.     As detailed in the Recommendation Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to Nestlé, who is already the largest single stockholder of the Company, owning approximately 19% of Aimmune's outstanding stock.

41.     The Recommendation Statement does not indicate why it was necessary to engage J.P. Morgan as an additional financial advisor after Lazard had already been engaged to serve as a financial advisor to the Independent Directors regarding the sales process. Moreover, the Recommendation statement fails to indicate, why Lazard could not accomplish the tasks necessary of it as a financial advisor. Such information is relevant considering J.P. Morgan and Lazar stand to make over $19 million and $17 million for their services rendered as financial advisors in relation to the Proposed Transaction.

42.     The Recommendation Statement is also unclear as to the existence or nature of any non-disclosure agreement entered into between Aimmune and any potentially interested third party, including Nestlé, as part of the sales process, and if the terms of any such agreements included "don't-ask, don't-waive" provisions or standstill provisions, and if so, the specific conditions, if any, under which such provisions would fall away.

43.     It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

*The Proposed Transaction*

44.     On August 31, 2020, Aimmune issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

**Brisbane, CA, August 31, 2020** – Aimmune Therapeutics Inc. (Nasdaq: AIMT), a biopharmaceutical company developing and commercializing treatments for potentially life-threatening food allergies, today announced that it has entered into a definitive agreement for Sociétés des Produits Nestlé, S.A. to acquire Aimmune for $34.50 per share in an all-cash transaction, implying a fully-diluted equity value

of $2.6 billion. Sociétés des Produits Nestlé, S.A. is a part of Nestlé Health Science (NHSc) and a wholly owned subsidiary of Nestlé S.A. The agreement was unanimously approved by all of the independent members of the Board of Directors of Aimmune. Greg Behar, CEO of Nestlé Health Sciences and an Aimmune Director, abstained due to his position with Nestlé Health Science.

"The agreement with Nestlé recognizes the value created by years of commitment and dedication to our mission by the team at Aimmune. Delivering PALFORZIA, the world's first treatment for food allergy, is a game-changing proposition in the bio pharmaceutical industry and is transformative for the lives of millions of people living with potentially life-threatening peanut allergy," said Jayson Dallas, MD, President and Chief Executive Officer of Aimmune. "This acquisition provides strong value for our shareholders and ensures a level of support for PALFORZIA and our pipeline that will further enhance their potential for patients around the world living with food allergies. Aimmune appreciates the continued strong collaboration with Nestlé Health Science dating back to 2016 through their support as a shareholder and board member, as well as through their consumer/nutrition strength and experience. Their extensive capabilities and global reach, as well as their alignment with our vision of pioneering treatments and solutions for food allergies, are a strong fit for our company."

"This transaction brings together Nestlé's nutritional science leadership with one of the most innovative companies in food allergy treatment," said Nestlé Health Science CEO Greg Behar. "Together, we will be able to create a world leader in food allergy prevention and treatment and offer a wide range of solutions that can transform the lives of people around the world living with food allergies."

The transaction is expected to close in the fourth quarter of 2020, pending the satisfaction of all conditions to the completion of the tender offer. Until that time, Aimmune will continue to operate as a separate and independent company.

**Transaction Details**

Under the terms of the merger agreement, Nestlé S.A.'s wholly-owned subsidiary, Société des Produits Nestlé S.A. (SPN), will commence a cash tender offer to acquire all outstanding shares of Aimmune common stock that are not already owned by NHSc for $34.50 per share in cash, and Aimmune agreed to file a recommendation statement containing the unanimous recommendation of the independent members of the Aimmune board that Aimmune stockholders tender their shares to SPN. Following the completion of the tender offer, Nestlé expects to promptly consummate a merger of Aimmune with a subsidiary of SPN, in which shares of Aimmune that have not been tendered in the tender offer will be acquired by SPN and converted into the right to receive the same cash price per share as paid in the tender offer.

The closing of the tender offer is subject to customary closing conditions, including the tender of a majority of outstanding Aimmune shares on a fully diluted basis which shall include the shares of Aimmune common stock currently held by Nestlé and its affiliates and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act and antitrust approvals in

Germany. The merger agreement includes customary termination provisions for both Aimmune and Nestlé.

***The Inadequate Merger Consideration***

45.     Significantly, the Company's financial prospects and opportunities for future growth, and synergies with Nestlé establish the inadequacy of the merger consideration.

46.     First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company and does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration the Company's potential financial success with its launch of Palforzia in January 2020 and its phase two pipeline egg allergy treatment and their potential growth.

47.     Aimmune's future success is extremely likely, given the innovation of novel drugs in a highly prevalent population of affected patients.  Obviously, the opportunity to invest in such a company on the rise is a great coup for Nestlé, however it undercuts the investment of Plaintiff and all other public stockholders."

48.     To be more specific, Biotechnology news source, Endpoints News, released an article about the Proposed Transaction, noting, "Baird's Brian Skorney estimated that the new cash, along with their credit facility with KKR, should give Aimmune a $450 million reservoir and resolve any questions about whether they'll have the capacity to commercialize Palforzia. It 'is more than enough to fund the launch of Palforzia and get to a point that settles the bull/bear launch debate,' he wrote in a note to investors. Separately, Aimmune announced an exclusive, $10 million licensing agreement for Xencor's XmAb7195, a humanized antibody designed to treat the underlying mechanisms behind allergic reaction. Aimmune's value has increased by over a third since Nestlé's initial investment, in large part thanks to Palforzia's success."  Such promise is likely to translate into strong financial success.

49.     Finally, the Proposed Transaction represents a significant synergistic benefit to Nestlé, which operates in the complementary industry as Aimmune, and will use the new portfolio, operational capabilities, and brand capital to bolster its own position in the market.  Specifically, in the August 24, 2020 Fierce Pharma article mentioned above, commented on Aimmune's benefits to Nestlé, "Bringing Aimmune on board will add some heft to Nestlé's health sciences

unit, launched in 2011, and its food allergy portfolio. Palforzia has blockbuster aspirations as the only approved peanut allergy therapy on the market, with Evaluate Pharma pegging its 2024 sales at roughly $1.28 billion."

50.     Clearly, while the deal will be beneficial to Nestlé it comes at great expense to Plaintiff and other public stockholders of the Company.

51.     Moreover, post-closure, Aimmune stockholders will be frozen out of any future benefit from their investment in Aimmune's bright future.

52.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Nestlé at the expense of Aimmune stockholders, which clearly indicates that Aimmune stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

53.     The Merger Agreement contains certain provisions that unduly benefit Nestlé by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination amount provision that is especially onerous and impermissible.  Notably, in the event of termination, the merger agreement requires Aimmune to pay $85 million to Nestlé, if the Merger Agreement is terminated under certain circumstances.  Moreover, under one circumstance, Aimmune must pay this termination fee even if it consummates any competing company Takeover Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.   The termination amount will make the Company that much more expensive to acquire for potential purchasers.  The termination amount in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

54.     The Merger Agreement also contains a "No Solicitation" provision that restricts Aimmune from considering alternative acquisition proposals by, *inter alia*, constraining Aimmune's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited

bona fide written *"Takeover Proposal"* if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

55.     Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, the Individual Defendants agreed to provide Nestlé information in order to match any other offer, providing Nestlé the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Nestlé.

56.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

57.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

### Potential Conflicts of Interest

58.     The breakdown of the benefits of the deal indicate that Aimmune insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Aimmune.

59.     Certain insiders stand to receive significant financial benefits as a result of the Proposed Transaction.  Notably, Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for large cash pay days upon the consummation of the Proposed Transaction, as follows:

| Name of Executive Officer or Director | Number of Shares Beneficially Owned(1) | Implied Cash Consideration for Shares |
|---|---|---|
| Dr. Jayson D.A. Dallas | 28,764 | $   992,358 |
| Greg Behar | 10,192 | $   351,624 |
| Patrick G. Enright(2) | 6,183,695 | $213,337,478 |
| Kathryn E. Falberg | 135,086 | $ 4,660,467 |
| Brett Haumann | 6,250 | $   215,625 |
| Mark T. Iwicki | 39,567 | $ 1,365,062 |
| Mark D. McDade | 26,852 | $   926,394 |
| Stacey D. Seltzer | 10,221 | $   352,625 |
| Dr. Daniel C. Adelman | 4,952 | $   170,844 |

| | | | |
|---|---|---|---|
| Eric H. Bjerkholt | 20,931 | $ | 722,120 |
| Andrew Oxtoby | 4,765 | $ | 164,393 |
| Douglas T. Sheehy | 14,982 | $ | 516,879 |
| Narinder Singh | 0 | $ | 0 |
| All of our current executive officers and non-employee directors as a group (13 persons) | 6,486,257 | $223,775,867 | |

60.     Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option or equity award, will be canceled and converted into the right to receive certain consideration according to the merger agreement, as follows:

| Name | Number of Unvested Company Options (#) | Value of Unvested Company Options ($)(1) | Number of Vested Company Options (#) | Value of Vested Company Options ($)(1) | Number of Unvested Company RSUs (#) | Value of Unvested Company RSUs ($)(2) |
|---|---|---|---|---|---|---|
| *Executive Officers* | | | | | | |
| Dr. Jayson D.A. Dallas | 466,667 | 3,898,418 | 293,333 | 1,840,382 | 92,550 | 3,192,975 |
| Dr. Daniel C. Adelman | 122,814 | 1,147,490 | 297,186 | 5,165,397 | 24,763 | 854,324 |
| Eric H. Bjerkholt | 164,532 | 1,743,502 | 296,718 | 3,797,123 | 26,325 | 908,213 |
| Andrew Oxtoby | 149,688 | 1,769,633 | 67,812 | 835,942 | 22,670 | 782,115 |
| Douglas T. Sheehy | 145,313 | 1,316,077 | 192,936 | 2,397,489 | 39,295 | 1,355,678 |
| Narinder Singh | 150,000 | 2,571,000 | — | — | 4,285 | 147,833 |
| *Directors* | | | | | | |
| Greg Behar | 15,398 | 267,771 | 75,942 | 843,228 | 7,840 | 270,480 |
| Patrick G. Enright | 15,398 | 267,771 | 174,457 | 4,582,495 | 7,840 | 270,480 |
| Kathryn E. Falberg | 15,398 | 267,771 | 56,187 | 841,253 | 7,840 | 270,480 |
| Brett Haumann | 23,332 | 405,743 | 2,121 | 36,884 | 13,313 | 459,299 |
| Mark T. Iwicki | 15,398 | 267,771 | 195,976 | 4,956,274 | 7,840 | 270,480 |
| Mark D. McDade | 15,398 | 267,771 | 161,029 | 4,141,469 | 7,840 | 270,480 |
| Stacey D. Seltzer | 15,398 | 267,771 | 108,608 | 2,320,206 | 7,840 | 270,480 |

61.     Moreover, certain employment agreements with certain Aimmune executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by Aimmune common stockholders, and will be paid out as follows

| Named Executive Officer | Cash ($)(1) | | Equity ($)(2) | Perquisites/ Benefits ($)(3) | | Total ($) | |
|---|---|---|---|---|---|---|---|
| Dr. Jayson D.A. Dallas | $ | 1,800,000 | 7,091,393 | $ | 56,244 | $ | 8,947,637 |
| Dr. Daniel C. Adelman | $ | 785,696 | 2,001,814 | $ | 23,559 | $ | 2,811,069 |
| Eric H. Bjerkholt | $ | 773,312 | 2,651,715 | $ | 39,192 | $ | 3,464,219 |
| Andrew Oxtoby | $ | 751,296 | 2,551,748 | $ | 31,410 | $ | 3,334,454 |
| Douglas T. Sheehy | $ | 728,248 | 2,671,755 | $ | 37,496 | $ | 3,437,499 |

62.     Thus, while the Proposed Transaction is not in the best interests of Aimmune's stockholders, it will produce lucrative benefits for the Company's officers and directors.

- 15 -

CLASS ACTION COMPLAINT

*The Materially Misleading and/or Incomplete Recommendation Statement*

63.     On September 14, 2020, the Aimmune Board caused to be filed a materially misleading and incomplete Recommendation Statement with the SEC that, in violation their fiduciary duties, failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning The Process Leading to the Proposed Transaction*

64.     Specifically, the Recommendation Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Recommendation Statement fails to disclose:

   a.  The Recommendation Statement fails to adequately explain why the engagement of J.P. Morgan was necessary, why Lazard could not accomplish the tasks provided by J.P. Morgan, or why Lazard was engaged given it required the aid of an additional financial advisor to serve as the Independent Board Members' financial advisor; and

   b.  The Recommendation Statement is also unclear as to the nature of the non-disclosure agreement entered into between Aimmune and any potentially interested third party, including Nestlé, as part of the sales process, and if the terms of any such agreements included "don't-ask, don't-waive" provisions or standstill provisions, and if so, the specific conditions, if any, under which such provisions would fall away

*Omissions and/or Material Misrepresentations Concerning Aimmune's Financial Projections*

65.     The Recommendation Statement fails to provide material information concerning financial projections provided by Aimmune's management and relied upon by J.P. Morgan and Lazard in their analyses.  The Recommendation Statement discloses management-prepared

financial projections for the Company which are materially misleading.  The Recommendation Statement indicates that in connection with the rendering of J.P Morgan's fairness opinion, J.P. Morgan reviewed, "certain internal financial analyses and forecasts prepared by the management of the Company relating to its business."

66.    In addition, the Recommendation Statement indicates hat in connection with the rendering of Lazard's fairness opinion, Lazard reviewed, "various financial forecasts and other data provided to it by the Company relating to the business of the Company."

67.    Accordingly, the Recommendation Statement should have, but fails to provide, certain information in the projections that Aimmune management provided to the Board, the Independent Board Members, J.P. Morgan, and Lazard.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

68.    With respect to the "Company Management Projections," the Recommendation Statement fails to provide material information concerning the financial projections prepared by Aimmune management.  Specifically, the Recommendation Statement fails to disclose material line items for the following metrics:

    a.  EBIT, including the included line items of operating expenses, which includes stock-based compensation expense;

    b.  Unlevered Free Cash Flow, including the included line items of taxes, expected working capital requirements, depreciation, amortization and capital expenditures.

69.    Additionally, the Recommendation Statement provides non-GAAP financial metrics, including EBIT and Unlevered Free Cash Flow, but fails to disclose a reconciliation of all non-GAAP to GAAP metrics.

70.    Further, the Recommendation Statement provides, on pp. 46-47, as follows:

    In creating the Early Long-Term Projections, Company management made various assumptions, including the

CLASS ACTION COMPLAINT

impact of COVID-19 on PALFORZIA, the probability of success of the Company's product candidates, timing for clinical trial completion and commercial launch, as well as estimated operational costs, including sales & marketing, research & development, manufacturing, and general & administrative, and other market and financial conditions and other future events, the results of which are reflected in the tables below.

71.     Despite this statement, the Recommendation Statement fails to provide the risk adjustments that were made to the Company's projections, nor does the Recommendation Statement provide the un-risked projections so Aimmune stockholders can evaluate the financial impact the Company's risk-adjustments had on the projections.

72.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

73.     Without accurate projection data presented in the Recommendation Statement, Plaintiff and other stockholders of Aimmune are unable to properly evaluate the Company's true worth, the accuracy of J.P. Morgan and Lazard's financial analyses, or make an informed decision whether to tender their Company stock in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the Recommendation Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by J.P. Morgan*

74.     In the Recommendation Statement, J.P. Morgan describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

75.     With respect to the *Selected Transactions Analysis*, the Recommendation Statement fails to disclose the following:

CLASS ACTION COMPLAINT

a.   The value of each selected precedent transaction; and

b.   The date on which each selected precedent transaction closed.

76.   With respect to the *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose the following:

a.   The specific inputs and assumptions used to calculate the perpetual growth rate range of negative 40% to negative 20%;

b.   The specific inputs and assumptions used to calculate the discount rate range of 10.0% to 14.0%;

c.   The Company's weighted average cost of capital;

d.   The Company's net cash as of June 30, 2020; and

e.   The Company's number of outstanding, fully-diluted shares.

77.   These disclosures are critical for stockholders to be able to make an informed decision on whether to tender their shares in favor of the Proposed Transaction.

78.   Without the omitted information identified above, Aimmune's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Aimmune public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.  As such, the Board has breached their fiduciary duties by failing to include such information in the Recommendation Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Lazard*

79.   In the Recommendation Statement, Lazard describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

80.     With respect to the *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose the following:

    a.   The specific inputs and assumptions used to calculate the discount rate range of 10.0% to 12.0%;

    b.   The Company's weighted average cost of capital;

    c.   The specific inputs and assumptions used to calculate the negative terminal growth rate range of negative 40% to negative 20%;

    d.   The Company's estimated net cash as of September 30, 2020; and

    e.   The Company's number of outstanding, fully-diluted shares, as of August 26, 2020.

81.     With respect to the *Selected Public Companies Analysis*, the Recommendation Statement fails to disclose the multiples and metrics for each selected company.

82.     With respect to the *Selected Precedent Transactions Analysis*, the Recommendation Statement fails to disclose the following:

    a.   The multiples and metrics for each selected precedent transaction;

    b.   The value of each selected precedent transaction; and

    c.   The date on which each selected precedent transaction closed

83.     With regards to the *Research Analysts Price Targets* the Recommendation Statement fails to provide the individual price targets analyzed and source thereof.

84.     With regards to the *Premia Paid Analysis* the Recommendation Statement fails to provide the specific premiums in each observed analysis.

85.     These disclosures are critical for stockholders to be able to make an informed decision on whether to tender their shares in favor of the Proposed Transaction.

86.     Without the omitted information identified above, Aimmune public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Aimmune's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best

interests.  As such, the Board has breached their fiduciary duties by failing to include such information in the Preliminary Stockholders.

## FIRST COUNT

### Claim for Breach of Fiduciary Duties

### (Against the Individual Defendants)

87.     Plaintiff repeats all previous allegations as if set forth in full herein.

88.     The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

89.     By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Aimmune.

90.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of Aimmune by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of Aimmune to its public stockholders.

91.     Indeed, Defendants have accepted an offer to sell Aimmune at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

92.     Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed vote on whether to approve the Merger.

93.     The Individual Defendants dominate and control the business and corporate affairs of Aimmune, and are in possession of private corporate information concerning Aimmune's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Aimmune which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

94.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

95.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Aimmune's assets and have been and will be prevented from obtaining a fair price for their common stock.

96.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

97.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

### Aiding and Abetting the Board's Breaches of Fiduciary Duty

### (Against Aimmune)

98.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

99.     Defendant Aimmune, knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.

100.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

101.     Plaintiff and the members of the Class have no adequate remedy at law.

**THIRD COUNT**

**Violations of Section 14(e) of the Exchange Act**

**(Against All Defendants)**

102.    Plaintiff repeats all previous allegations as if set forth in full herein.

103.    Defendants have disseminated the Recommendation Statement with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

104.    Section 14(e) of the Exchange Act provides that in the solicitation of shares in a tender offer, "[i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.].

105.    The Recommendation Statement was prepared in violation of Section 14(e) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Recommendation Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

106.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

107.    The Individual Defendants were at least negligent in filing a Recommendation Statement that was materially misleading and/or omitted material facts necessary to make the Recommendation Statement not misleading.

108.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of its entitlement to decide whether to tender its shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Transaction.

109.    Plaintiff and the members of the Class have no adequate remedy at law.

CLASS ACTION COMPLAINT

**FOURTH COUNT**

**Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9**

**(Against All Defendants)**

110.    Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

111.    Defendants have disseminated the Recommendation Statement with the intention of soliciting stockholders to tender their shares in favor of the Proposed Transaction.

112.    Section 14(d)(4) requires Defendants to make full and complete disclosure in connection with a tender offer.

113.    SEC Rule 14d-9 requires a Company's directors to, furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

114.    Here, the Recommendation Statement violates both Section 14(d)(4) and SEC Rule 14d-9 because it because it is materially misleading in numerous respects, omits material facts, including those set forth above and Defendants knowingly or recklessly omitted the material facts from the Recommendation Statement.

115.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of its entitlement to decide whether to tender their shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Transaction.

116.    Plaintiff and the members of the Class have no adequate remedy at law.

**FIFTH COUNT**

**Violations of Section 20(a) of the Exchange Act**

**(Against all Individual Defendants)**

117.    Plaintiff repeats all previous allegations as if set forth in full herein.

118.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and

Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the S-4 was materially misleading to the Company stockholders.

119. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the S-4 and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the S-4. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the S-4 before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

120. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Aimmune's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the S-4 was misleading. As a result, the Individual Defendants are responsible for the accuracy of the S-4 and are therefore responsible and liable for the misrepresentations contained herein.

121. The Individual Defendants acted as controlling persons of Aimmune within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Aimmune to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Aimmune and all of its employees. As alleged above, Aimmune is a primary violator of Section 14 of the Exchange Act and SEC Rule S-4. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

122. Plaintiff and the members of the Class have no adequate remedy at law.

CLASS ACTION COMPLAINT

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class, and against the Defendants, as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.      Enjoining the Proposed Transaction;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E.      Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Aimmune and obtain a transaction which is in the best interests of Aimmune and its stockholders;

F.      Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: September 21, 2020

**BRODSKY & SMITH, LLC**

By: _____
Evan J. Smith, Esquire
Ryan P. Cardona, Esquire
9595 Wilshire Blvd., Ste. 900
Phone: (877) 534-2590
Facsimile (310) 247-0160
esmith@brodskysmith.com
rcardona@brodskysmith.com

CLASS ACTION COMPLAINT